THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNIE L. SAVORY, Defendant-Appellant.

Second District    No. 81-465

Opinion filed May 5, 1982.—Rehearing denied May 28, 1982.

1024

Mary Robinson and Theodore A. Gottfried, both of State Appellate Defender's Office, of Springfield, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:

Defendant, Johnnie Lee Savory, was convicted following a jury trial in the circuit court of Lake County of two offenses of murder and was thereafter sentenced to concurrent terms of 40 to 80 years imprisonment. He appeals, contending (1) his statements to police were elicited in violation of his *Miranda* rights; (2) the State was improperly allowed to introduce evidence and comment upon defendant's exercise of his right not to make a statement to police; (3) evidence suggesting defendant had previously committed another crime was admitted; and (4) defendant's trial attorney failed to provide him effective assistance of counsel.

Defendant's first conviction of the January 18, 1977, murders of James Robinson, Jr., and Connie Cooper in Peoria County was reversed on appeal and remanded for a new trial (*People v. Savory* (1980), 82 Ill. App. 3d 767, 403 N.E.2d 118). The Illinois Supreme Court denied leave to appeal ((1980), 81 Ill. 2d 598), the United States Supreme Court denied certiorari ((1981), 449 U.S. 1101, 66 L. Ed. 2d 827, 101 S. Ct. 896) and the cause was transferred to Lake County for retrial.

Defendant was 14 years of age at the time of these offenses. On January 25, 1977, one week after the victims' bodies were discovered (they had been killed by stabbing between 8 and 9 a.m. on January 18), two police officers met with defendant at 3:30 p.m. at his school in a room adjacent to the principal's office. The officers told defendant they wished

to speak to him in regard to the deaths of Connie Cooper and James Robinson, and defendant first responded he did not want to talk to them or give any statements. The officers persisted and advised defendant he may have been one of the last persons to see the victims while they were still alive and might give the police some leads as to the perpetrator of the murders. He then agreed to give an account of his activities on the day prior to the murders.

Defendant informed the officers he had met James Robinson at school on January 17 around 3:30 p.m.; the pair had gone to the Robinson residence arriving at 7 p.m.; they had taken some corn and hot dogs out of the refrigerator, prepared and ate this meal and after finishing they placed a television set on the floor and practiced Kung Fu in the living room. The two left the Robinson residence for a few hours but returned to practice Kung Fu and defendant told the officers he left at 11 p.m., walked home and later spoke to Robinson on the telephone until around 1:30 a.m. Defendant said Robinson asked him to return at 8 the next morning but that he did not do so. Defendant also indicated to the police that he and Robinson were close friends and he had known him and Miss Cooper for many years.

At approximately 4 p.m. at the school, the officers asked defendant to return with them to the police station for a meeting with other officers working on the case, and he agreed. Defendant was not placed under arrest or handcuffed, nor was there a show of weapons or force at this or any later time. On the drive to the station, defendant suggested they stop at his father's house so he could show them a knife that was similar to one owned by Robinson and the officers agreed. Defendant was allowed to enter the home alone, and he returned without the knife saying his father must have it with him and was not at home. At 5 p.m. defendant was brought into an interrogation room at the police station and he repeated his previous story in the presence of four officers until about 5:30 p.m.

Following this second interrogation defendant was given two sodas and ate part of a candy bar and was allowed to go to the restroom unaccompanied. One of the officers returned to defendant's home and retrieved a knife from defendant's father, who told the officers that it was his knife and that defendant had commited no crime. The officers noted certain discrepancies between other information received relating to the case and defendant's story; one officer testified he knew at this time that defendant was not being truthful with them. At 6 p.m. defendant was again interviewed by officers in the police station. In this 45-minute session the officers called to defendant's attention certain discrepancies between known facts and defendant's statement to them: (1) that defendant had stated he and Robinson were very close friends and he had known Robinson and Cooper for years; (2) that he and Robinson had cooked a

meal on the evening of January 17; and (3) that he had telephoned Robinson and talked to him until 1:30 a.m. on January 18. When confronted with information challenging these portions of his story, defendant admitted he had been lying to the officers during some parts of the earlier interview. Thereafter, from 10 p.m. until 11 p.m., defendant was questioned by a polygraph examiner and, after the results were made known to the police, they arrested him for murder and first advised him of his *Miranda* rights.

At defendant's first trial his motion to suppress the statements made by him on January 25, and a confession given by him on the following day, was denied. On his first appeal defendant sought review of the denial of his motion to suppress, but only as to the confession given on the second day of his interrogation, and the appellate court reversed on grounds it should have been excluded as involuntary. On retrial, defense counsel urged that evidence of the first day's conflicting statements should also be suppressed, but the trial court declined to do so, finding defendant was not in custody when those statements were made.

At trial, in addition to the January 25 statements to the officers, three acquaintances of defendant testified that he had told them on the day of the murders that he had stabbed the victims and they were dead. These admissions by defendant were made at a time when the bodies had not yet been discovered and included descriptions of the victims' multiple stab wounds consistent with those depicted in photographic and other evidence of the crime scene. Evidence was also presented that defendant had a knife (which he had with him when he admitted his complicity to one of the witnesses), and that type A blood matching that of one of the victims, but not defendant, was found on a pair of pants from defendant's residence. Defendant did not testify in trial but presented evidence of an alibi and sought to blame the victims' step-father for the murders.

We consider first defendant's contention that his motion to suppress his statements to the police on January 25 should have been granted because the officers failed to comply with the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

■■■ The State initially points out that defendant's similar motion was denied in his first trial and, as he did not seek review of that portion of the order of the trial court, it became *res judicata* and the law of the case and he has waived or is collaterally estopped from doing so now. We must disagree. It is true that these doctrines bar relitigation of an unappealed order denying a motion to suppress, but they only do so in the absence of exceptional circumstances. (*People v. Armstrong* (1973), 56 Ill. 2d 159, 161, 306 N.E.2d 14, 15; *People v. Eckmann* (1978), 60 Ill. App. 3d 300, 302, 376 N.E.2d 751, 752.) Here such circumstances were present inasmuch as the January 25 statements which defendant sought to suppress in the

second trial were not relied upon by the prosecution in the first trial and, necessarily, the issue of suppression of evidence which could not have contributed to his first conviction would have been considered moot on review in the first appeal. See *People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283.

The trial judge, in denying defendant's motion to suppress in his second trial, determined *Miranda* was inapplicable to defendant's January 25 statements because he was not in custody when they were given. Custodial interrogation, which the *Miranda* decision governs, means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612; *People v. Brownson* (1982), 103 Ill. App. 3d 476, 431 N.E.2d 744.) In determining whether a statement was made in a custodial setting, the court must look to all of the circumstances surrounding the questioning, with no single factor deemed controlling, and then objectively evaluate whether a reasonable, innocent person would have believed he was free to leave or was expressly or impliedly bound to remain in the presence of police. *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873; *People v. Cart* (1981), 102 Ill. App. 3d 173, 183, 429 N.E.2d 553, 562; see also *People v. Kennedy* (1978), 66 Ill. App. 3d 267, 383 N.E.2d 713.

Numerous factors are to be considered in this inquiry: the location (*e.g., People v. Hentz* (1979), 75 Ill. App. 3d 526, 394 N.E.2d 586), time (*Cummings v. State* (1975), 27 Md. App. 361, 341 A.2d 294), length (*State v. Skiffer* (1969), 253 La. 405, 218 So. 2d 313), mood and mode (*People v. Bailey* (1973), 15 Ill. App. 3d 558, 304 N.E.2d 668 (including extent of knowledge of facts possessed by police)) of the interrogation; the number of police officers present (*United States v. Kennedy* (9th Cir. 1978), 573 F.2d 657; *People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d 1098) and the presence or absence of friends or family of the accused (*People v. Bryant* (1967), 87 Ill. App. 2d 238, 231 N.E.2d 4); any indicia of formal arrest of the subject including physical restraint, show of weapons or force, booking, fingerprinting or informing the person he is under arrest (see *People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605); the manner in which the person questioned got to the place of interrogation, *i.e.*, voluntarily on his own, in response to a police request, or on a verbal command indicating compulsion (see *State v. Cassell* (Alas. 1979), 602 P.2d 410); whether he voluntarily assists police in their investigation (see *People v. Cart* (1981), 102 Ill. App. 3d 173, 429 N.E.2d 553); whether the subject is allowed to walk within and from the location of the interrogation unaccompanied by police (*People v. Mrozek* (1977), 52 Ill. App. 3d 500, 367 N.E.2d 783); and the age, intelligence and mental makeup of the accused (*People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d

1098). We must then apply the objective test and these factors to defendant's interviews by the officers.

Defendant was first questioned at his school in a room adjacent to the principal's office, a less coercive environment than a police station, in the daytime and for about one-half hour; the questioning appeared to be inquisitory rather than accusatory. Two officers and defendant were present and there was no indicia of arrest. He may not be considered to be in custody at his school. (See *People v. Shipp* (1968), 96 Ill. App. 2d 364, 239 N.E.2d 296.) Thereafter, he responded to a police request to come down to the police station to give his information to other officers. On the way, he volunteered to go to his house to look for a knife, and he was allowed to do so while the officers remained in their vehicle. His second half-hour interview with the four officers at the police station again appears to be of an inquisitory nature on their part seeking information which might assist in their investigation, but not focusing on defendant as the offender. We conclude defendant was still not in custody during this period.

The third interview commencing at 6 p.m. presents different circumstances. Like the second it occurred in a small interrogation room in the police station and lasted about three-quarters of an hour. Defendant had by then been with the police for over 2½ hours. The officers, however, became accusatory as they began doubting defendant's account and they suggested they had reliable information discounting his version of the events. (See *State. v. Menne* (La. 1980), 380 So. 2d 14, *cert denied* (1980), 449 U.S. 833, 66 L. Ed. 2d 39, 101 S. Ct. 104.) Although defendant had not been formally arrested, physically restrained, booked, or fingerprinted, a reasonable person might well have believed at the third interview, when his story was being discounted, that he was in police custody. While not determinative, the fact that the officers testified defendant was not free to leave the police station (although they did not so inform him) is of some relevance to our inquiry. (*People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 1128, 408 N.E.2d 1098, 1103.) Similarly, that defendant was but 14 years of age at this time must be considered.

We conclude that at the third session when the officers, who testified they then knew defendant was not being truthful with them, so informed him and pointed out discrepancies between defendant's version and their own information, he was in custody and should have been given *Miranda* warnings. See *People v. Townes* (1982), 91 Ill. 2d 32.

■■ The State argues that when the officers confronted defendant with the discrepancies in his story this did not constitute interrogation and *Miranda* is inapplicable. However, interrogation includes express questioning and "any words or actions on the part of the police * * * that

[they] should know are reasonably likely to elicit an incriminating response." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689.) Confronting defendant with the discrepancies in his story was, in our view, the functional equivalent of express questioning under *Innis*. See *People v. Burson* (1980), 90 Ill. App. 3d 206, 412 N.E.2d 1160.

■ The State does not expressly argue that any error in admitting defendant's first day statements was harmless, but points out he made no inculpatory statements prior to receiving the *Miranda* warnings. The reviewing court on defendant's first appeal also noted he made no incriminating statements until the second day of his interrogation. (See *People v. Savory* (1980), 82 Ill. App. 3d 767, 770, 403 N.E.2d 118, 121, *cert. denied* (1981), 449 U.S. 1101, 66 L. Ed. 2d 827, 101 S. Ct. 896.) We have reviewed defendant's statements to police on the first day of questioning prior to being advised of his rights and find he gave an exculpatory narrative of events of the day prior to the murders and subsequently admitted he had lied regarding three collateral facts: who had cooked the evening meal, whether the defendant and Robinson were very good friends who had known each other for years and whether defendant telephoned Robinson later the evening before the latter's death. In view of the testimony of the three witnesses who related defendant's admissions to them of his presence and complicity in the killings, we consider the admission of these statements in trial to be harmless error beyond a reasonable doubt. See *People v. Gan* (1979), 75 Ill. App. 3d 72, 394 N.E.2d 611.

Defendant next contends error occurred when the State offered testimony that defendant, after being asked at school if he knew anything in regards to the victim, James Robinson, stated "he didn't want to talk about it, he didn't want to make any statements" and the prosecutor commented in closing argument:

"I believe you heard that on that date of January 25th, 1977, Officers George Pinkney and Edgar Hanes went to the Late Afternoon School to talk to Johnnie Savory, who they thought might have some information regarding the case. They asked him that afternoon about 3:30, they wanted to talk to him about [Robinson], what he might know. The Defendant, what did he say at that time, ladies and gentlemen? 'I don't want to talk about it. I won't make any statements.' This, ladies and gentlemen, the apparent good friend of his, he doesn't want to talk about it, doesn't want to help the police at that time."

Defendant raises both constitutional and general evidentiary grounds in contending the evidence and argument combined to deprive him of a fair trial.

We note initially that this case involves more than impeachment with and comment upon defendant's silence; rather, his express statement he did not wish to talk to the officers was offered as direct evidence of his guilt. Furthermore, defendant made this statement prior to being either arrested or under custodial detention and before he was advised of his *Miranda* rights. These circumstances distinguish the case from *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124, *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, and the many Illinois cases considering pre and post-custodial detention silence used for purposes of impeaching a defendant's trial testimony (see *People v. Adams* (1981), 102 Ill. App. 3d 1129, 430 N.E.2d 267; *People v. Malkiewicz* (1980), 86 Ill. App. 3d 417, 408 N.E.2d 47). We have been directed to or discovered only three cases which have considered the constitutional aspects of the introduction of evidence and comment thereon drawing an inference of guilt from silence or from a refusal to speak with police prior to the accused being warned of *Miranda* rights, arrested or otherwise held in custody. Compare *United States v. Henderson* (5th Cir. 1978), 565 F.2d 900 (applying post-arrest cases and principles to find reversible error) with *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (no constitutional issue is presented; instead, question is purely an evidentiary one of relevancy) and *United States v. Robinson* (E.D. N.Y. 1981), 523 F. Supp. 1006 (no constitutional issue presented).

There is no need here to address the constitutional question as under general evidentiary principles the evidence and argument was erroneous. In *People v. Wright* (1975), 32 Ill. App. 3d 736, 741, 336 N.E.2d 18, 22, where evidence a defendant in similar circumstances had refused to answer questions was admitted, the appellate court reversed, noting:

> "Long before the United States Supreme Court held, in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, that defendants have a right to remain silent in the face of police interrogation, the Illinois Supreme Court held it was error for the State to offer testimony as to defendant's refusal to make a statement. In *People v. Rothe* (1934), 358 Ill. 52, 57, 192 N.E. 777, this refusal had been offered, as here, by the testimony of an officer. As clarification for its reversal, the court stated 'the fact that [the defendants] refused to make a statement had no tendency to either prove or disprove the charge against them. The admission of this evidence was prejudicial, and since it was neither material nor relevant to the issue being tried it should have been excluded.' This rule was reaffirmed by the court in *People v. Lewerenz* (1962), 24 Ill. 2d 295, 299, 181 N.E.2d 99."

Later in *People v. Rehbein* (1977), 54 Ill. App. 3d 93, 369 N.E.2d 190, *aff'd* (1978), 74 Ill. 2d 435, 386 N.E.2d 39, *cert. denied* (1979), 442 U.S. 919, 61

L. Ed. 2d 287, 99 S. Ct. 2843, the court noted the rule set forth in *Rothe* and *Wright* did not depend upon whether the defendant's silence, which the State utilized, occurred prior in time to the point when he became entitled by his custody to receive *Miranda* warnings.

The State's reliance upon *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 414 N.E.2d 1318, is misplaced as that court noted that the prosecution did not draw an inference of guilt from defendant's behavior when he walked into a police station, said he had killed his wife, but then remained silent when an officer asked if there was anything else he could tell them. The prosecutor in closing argument had briefly mentioned the defendant's failure to respond but did not, as here, also offer to the jury an inference that defendant did not wish to make a statement because he was guilty of the offense.

██ The use by the State of defendant's statement that he did not want to talk to the police from which to draw a direct inference of guilt was improper. However, we have considered the State's closing argument as a whole and conclude this portion to be harmless error beyond a reasonable doubt in view of the other clear evidence of defendant's guilt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Hairston* (1980), 86 Ill. App. 3d 295, 299-300, 408 N.E.2d 382, 386.

Defendant also contends he was not afforded effective assistance of counsel in trial asserting his attorney was actually incompetent in carrying out his duty to him to his substantial prejudice. See *People v. Lovitz* (1981), 101 Ill. App. 3d 704, 710, 428 N.E.2d 727, 731.

██ At trial, evidence was introduced that a pair of pants found in defendant's house had type A blood stains on them matching the blood type of one of the victims, but not defendant. Defendant's father testified the pants were his and the blood stains were made by him. Defense counsel did not produce evidence or a stipulation, as had been done in the first trial, that the father's blood was type A. The State also introduced in evidence the knife defendant's father had given to police and argued it was defendant's knife. Defense counsel did not elicit from the officer who received the knife the fact the father had told the police the knife was his rather than defendant's. Also, it is asserted defense counsel did not seek a trial court ruling on whether the reviewing court's opinion in the first appeal was based upon the involuntariness of defendant's statements or merely a *Miranda* violation which would allow the State to offer them to impeach defendant. The appellate defender now suggests defendant was not called to testify on his own behalf because of the uncertainty of this possible basis for impeachment.

We conclude each of these matters involved trial tactics and strategy, requiring the exercise of professional judgment, and are insufficient to support a claim of ineffective representation of counsel. (*People v.*

*Haywood* (1980), 82 Ill. 2d 540, 543-44, 413 N.E.2d 410, 412; *People v. Greer* (1980), 79 Ill. 2d 103, 122, 402 N.E.2d 203, 212.) The State did not rebut defendant's father's testimony that the pants and blood were his, not defendant's, and further proof was unnecessary. As to the impeachment of witnesses we will not second-guess trial counsel who may have considered their testimony was not credible as given and did not want to risk permitting them to cure any deficiencies on further cross-examination. Moreover, defendant may well have decided not to testify because of factors unrelated to his potential impeachment.

We turn finally to defendant's contentions related to the admission of evidence of other offenses and his attorney's failure to object thereto or to impeach the witness.

Tina Ivy testified that she was with defendant on the day of the murders and that when they separated he was going to see his probation officer. Defense counsel did not object nor did he raise this matter in the written post-trial motion. Further, defendant's probation officer was not then called to impeach Tina Ivy's testimony as to the time of day defendant arrived to see him. Defendant suggests the admission of this testimony was improper as other-crimes evidence, but we note this matter was waived and find it is not plain error on this record. Furthermore, counsel's failure to object or to then impeach by calling defendant's probation officer appears to have been designed to avoid highlighting the inadvertent disclosure defendant was on probation.

Accordingly, the judgment of the circuit court will be affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.